IN RE ESTATE OF SADIE F. JACKMAN, deceased.

No. 50979.

(Reported in 122 N.W.2d 910)

412

July 16, 1963.

McMahon & Cassel, of Algona, for appellant, Emmett C. Jackman.

Linnan, Lynch & Straub, of Algona, for appellee, St. Thomas Church.

Robert F. Culver, of Emmetsburg, for executrix.

THORNTON, J.— ■ This is an application in probate to determine the assets properly includable in the estate of Sadie F. Jackman, deceased, and to direct the disposition of assets not includable. The application brought by the executrix in probate is reviewable on errors and not de novo. In re Estate of Rahfeldt, 253 Iowa 432, 112 N.W.2d 858; and In re Estate of Shivvers, 240 Iowa 93, 100, 34 N.W.2d 632.

The contest is between appellant, Emmett C. Jackman, a stepson of decedent, Sadie F. Jackman, claiming as a remainderman under the will of P. C. Jackman, deceased, and appellee, St. Thomas Church, residuary beneficiary under the will of decedent, Sadie F. Jackman, a life tenant under P. C. Jackman's will. The trial court held Emmett C. Jackman was estopped from claiming the unidentified assets in the hands of the executrix, that Sadie F. Jackman found it necessary to use some of the funds derived from the sale of bank stock for her personal needs and identifiable funds, certificates of deposit, held in the name of the P. C. Jackman estate in the sum of $4649.10, constituted the remainder interest, such were the property of appellant and all other assets listed in the application were assets of the Sadie F. Jackman estate. There is sufficient evidence to sustain the trial court on the issue of estoppel, and as to the identifiable property in the hands of the executrix, except as to one certificate of deposit in the sum of $1000 held by decedent, Sadie F. Jackman, at the time the P. C. Jackman estate was closed and which she cashed on September 26, 1958, when the record shows as a matter of law she had ample funds on hand for her necessary care and support.

P. C. Jackman died March 1, 1953. In Item Two of his will he left his widow, Sadie F. Jackman, a life estate in all his property, and provided:

"* * * Said provision is made for my said wife, for her lifetime, in order that she may be properly cared for, and that she may have the care and support that she deserves. The entire

income from my said property is to be hers, to use as she may need, or see fit, and, in the event that the income from said life estate is insufficient to properly care for her, then, my executors hereinafter named and appointed, are directed to sell or mortgage necessary portions of my said property, as may be required to carry out the terms and provisions of this bequest and direction."

Emmett C. Jackman, son of P. C. Jackman, was given the remainder interest in 120 acres of land and in capital stock of the Iowa Trust & Savings Bank of Emmetsburg, Iowa. A stepson, James W. Fay (son of Sadie F. Jackman), was given the remainder interest in 80 acres of land and stock in a hotel company (this hotel stock does not appear in estate proceedings of the P. C. Jackman estate). Item Eight of the will directed all taxes levied against the estate either by the Federal or State Government be paid from the residuary part thereof. Item Nine provided:

"At the termination of the life estate created in ITEM Two hereof, I direct that all funds and monies held by my Executors, or their successor or successors in office, shall be divided as follows: Two-Thirds (2-3rds) to my son, Emmett C. Jackman of Estherville, Iowa, and One-Third (1/3rd) to my stepson, James W. Fay of Emmetsburg, Iowa."

In Item Ten Sadie F. Jackman and Emmett C. Jackman were nominated executors without bond. Emmett C. Jackman and James W. Fay were directed to manage and operate the real estate. It was directed that James W. Fay be attorney for the executors. All were to serve without compensation.

■ I. The will gives the widow a life estate. The income was hers to use as she may need or see fit. In other words it was hers absolutely. The executors were given the power and duty to invade the corpus of the estate, they could sell or mortgage such as may be required when the income was insufficient to properly care for the widow. The bequests of capital stock subject to the life estate were specific bequests, the devises of real estate subject to the life estate were specific devises. The direction in Item Eight to pay taxes from the residue of the estate would properly include Iowa inheritance taxes, though

our inheritance tax is not a property tax but upon the right of succession. In re Estate of Millard, 251 Iowa 1282, 1291, 105 N.W.2d 95, 101. This is an expression of intention by the testator and followed by Sadie F. Jackman either acting solely or with Emmett C. Jackman as executors in the payment of inheritance taxes in the sum of $478.67.

Item Nine must be construed as a residuary clause. This is compelled by Item Eight. See Moore v. McKinley, 246 Iowa 734, 756, 757, 69 N.W.2d 73, 86, 87. And avoids partial intestacy, Starr v. Newman, 225 Iowa 901, 905, 281 N.W. 830. The only property to be divided under the provisions of Item Nine is that not specifically devised or bequeathed.

From Items Two and Nine it is clear the testator intended the nominated executors or their successors to hold the property of the estate for the benefit of the widow during her lifetime. As bearing on the above interpretation of the will, see Tague v. Tague, 248 Iowa 1258, 85 N.W.2d 22; Watkins v. Dean, 243 Iowa 599, 52 N.W.2d 498; Lovrien v. Fitzgerald, 242 Iowa 1258, 49 N.W.2d 845; and In re Estate of Whitman, 221 Iowa 1114, 266 N.W. 28.

II. After P. C. Jackman's death March 1, 1953, Sadie F. Jackman and appellant qualified as executors on April 6, 1953. On March 1, 1953, P. C. Jackman's checking account showed a balance of $2732.05. On the date the executors qualified, Sadie F. Jackman transferred the then balance of the account of $1355.98 to her personal account. Of the checks charged to the account between the date of P. C. Jackman's death and this transfer there is only one identifiable, for funeral expenses of $910.56.

The bank stock bequeathed to appellant was subject to a stockholders' agreement to sell to surviving stockholders. This was done November 3, 1953. The proceeds of the sale, $10,404, were deposited in a checking account in the name of Estate of P. C. Jackman, Sadie F. Jackman and Emmett C. Jackman, executors. Either or both executors were authorized to sign checks. This is the item appellant contends should be paid to him in full as remainderman. He also asks for an accounting under Item Nine.

416

James W. Fay died June 12, 1956. Mrs. Jackman then employed Mr. Peter Narey, attorney of Spirit Lake, to handle both the P. C. Jackman and James W. Fay estates. The Fay estate is important because both Mrs. Jackman and appellant received property under the will, inheritance taxes were paid on behalf of appellant, both were executors, and a course of dealing with the estate business is shown. An inventory was filed in the P. C. Jackman estate March 7, 1957. The property was appraised. Inheritance tax was paid in the sum of $478.67. A final report was filed showing no accounting whatsoever. An application for certificate of payment of personal taxes filed on the same date showed no taxable personal property for the years 1954, 1955, 1956 and 1957. Both were sworn to by Mrs. Jackman and appellant. The estate was closed December 17, 1957. In the file is an order allowing attorney fees of $835.50 and a receipt therefor. The order also allows fees for the executor in the same amount. There is no receipt for such and appellant testified he did not receive any fees. The James W. Fay estate was handled in the same manner. It was closed on the same date with no accounting. In the Fay will Mrs. Jackman was given all of the personal property and appellant was given the remainder interest in the 80-acre tract which Mr. Fay had received under the P. C. Jackman will, subject to Mrs. Jackman's life estate. The appraised value of the personalty was $3812.62, of the realty $14,000. We do not have before us the liabilities deductible nor the factor to determine the amount of inheritance tax on the remainder received by appellant, section 450.51, Code of Iowa, 1954, but the record shows as a matter of law Mrs. Jackman paid inheritance taxes in the sum of $1107.05 which were the obligation of appellant.

In speaking of this estate appellant testified, "* * * I did not write any checks as an executor nor did I transact any business of any kind. * * *." The receipt of the State Tax Commission, dated November 12, 1957, is in the file showing payment of the inheritance taxes. A deposit slip shows Mrs. Jackman received $2586.27 from the Fay estate November 26, 1957. There is a check charged to Mrs. Jackman's personal account on November 16, 1957, for the exact amount of the

inheritance tax. It would make no difference whether the inheritance tax was paid from Mrs. Jackman's personal account or from the funds she was entitled to in the Fay estate. In any event her funds were used (or a portion of the $10,404 from the sale of the bank stock) for the benefit of appellant. As a matter of law she did not owe any inheritance tax in the Fay estate. A mother's individual exemption is $10,000, section 450.9, Code of Iowa, 1954. The tax had to be on the remainder interest devised to appellant and the tax was payable by him. Sections 450.5 and 450.53, Code of Iowa, 1954; In re Estate of Millard, 251 Iowa 1282, 1291, 105 N.W.2d 95, 101; and In re Estate of Johnson, 220 Iowa 424, 426, 262 N.W. 811. This item was not considered separately by the trial court nor argued here, but it plainly appears as a matter of law from the evidence introduced. It differs from the inheritance tax in the P. C. Jackman estate in the sum of $478.67. (A check for this amount was charged to Mrs. Jackman's account September 16, 1957, five days after the date of the receipt of the tax commission.) Item Eight of the will provided that amount should be paid from the residuary estate.

III.  In her application the executrix showed the following assets in her hands, two certificates of deposit totaling $12,000 issued to Sadie F. Jackman, two certificates of deposit totaling $4649.10 in the name of the P. C. Jackman estate, $1437.56 in Mrs. Jackman's checking account, and $158.77 in checks payable to her, a total of $18,245.43. The only witnesses in the trial court were Ruth Clasen, executrix, a vice president of the Iowa Trust and Savings Bank of Emmetsburg, Iowa, and appellant. The bank records of P. C. Jackman's personal account; Mrs. Jackman's personal checking account, the account above referred to in the name of the P. C. Jackman estate, bank deposit book and the signature card for this account, the deposit slips and a resumé thereof in Mrs. Jackman's account, a list showing the history of all pertinent certificates of deposits, Mrs. Jackman's canceled checks for the years 1958, 1959 and 1960, and the estate files were introduced in evidence. No canceled checks other than those of Mrs. Jackman were located or placed in evidence.

From appellant's testimony it is clear he allowed his step-

mother to take over the handling of all the funds and all the business of his father's estate. He merely signed what he was asked to and did nothing more. He testifies that on three different occasions his stepmother showed him the bankbook showing the deposit of $10,404 from the sale of the bank stock and that he took this to mean the sum was still intact. It is also clear from the testimony of the executrix the banking business was done by Mrs. Jackman. Mrs. Jackman lived in Emmetsburg, the situs of the estate, and appellant lived in Eagle Grove and traveled eastern Iowa. His only apparent contact with his father's estate before Mr. Fay's death was incident to the sale of the bank stock. He knew the sale price, signed the stock certificate and the signature card for the estate account in which the proceeds were deposited. It is not contended this sale was for the care of the life tenant. Appellant also signed the necessary papers to close the estate. He did not assist in their preparation. He testified:

"* * * I left everything to my stepmother. I did not write checks on the account. * * * I made no complaint during my stepmother's lifetime. I had nothing to complain about. I had to get along. I offered to help on several occasions but my help was refused."

IV. Appellant contends for reversal there could be no estoppel because the life tenant, Mrs. Jackman, was in no way misled to her prejudice; that there was no fraudulent conduct or fraudulent result; in fact all the elements of estoppel are present to estop the executrix and beneficiaries of Mrs. Jackman.

Appellee contends the funds must be traceable into the funds of the life tenant on hand at the time of death before such can be set off to the remainderman; the closing of the estate is a finality; a coexecutor is bound by the acts of his coexecutor, that he cannot avoid responsibility; and where one stands by and sees another about to commit, or in the course of committing, an act infringing on his rights and fails to assert his title or right, he is afterward estopped to assert it. It also points out a discharged executor no longer has any right to a fund turned over to a life tenant.

A portion of this case asked for by appellant and not con-

sidered separately by the trial court is the estate accounting. Necessarily this accounting precedes the use of the funds for care and support of the life tenant. An accounting such as it was, was actually made. Though far from complete, it does show the payment of certain items. First there are the general assets consisting of $2732.05 in the checking account of decedent P. C. Jackman on the date of death. The evidence, including the estate file and bank record of the bank account, shows a funeral bill of $910.56, an attorney fee of $835.50, and inheritance tax of $478.67, or a total of $2224.73, thus leaving a balance of $507.32. Of this amount, $445.42 was charged to the account while still in decedent P. C. Jackman's name between March 1, 1953, and April 6, 1953, when Mrs. Jackman transferred the balance of the account to her account. It is inconceivable that a man owning 200 acres of land in the ordinary course of living would not have some outstanding obligations on his death. Of course it was the duty of the executors to pay such. In addition court costs were undoubtedly paid, a matter easy to ascertain by either party, but we are not favored with the amount.

There is the additional item of a $1500 mortgage, as shown by the inventory in the P. C. Jackman estate, on the 80-acre tract, the remainder interest of which was given to James W. Fay. In the Fay estate this 80 acres was inventoried as having no mortgage. Apparently somebody paid this mortgage. It was not appellant. It should be remembered in this regard that the inventories in the two estates, P. C. Jackman and James W. Fay, were both signed by the appellant on the same day, February 5, 1957. It is obvious there were not sufficient funds left from the general assets to pay this mortgage. There is a $1500 check charged against the account opened in the name of the P. C. Jackman estate on November 18, 1953. The witnesses were unable to identify this charge in any manner. However, we think the evidence, taken as a whole, as to the general assets and the payment of the mortgage, is sufficient to sustain the finding of estoppel against appellant as far as handling these items is concerned.

It is the duty of an executor to responsibly know the business of the estate. Though appellant disclaims all knowl-

edge, he must be held to know what was in the inventories and final reports signed by him. At least to this degree he has participated in the accounting. He is not in a position to say such should not be charged to him, section 638.14, Code of Iowa, 1954. He is bound to know as a beneficiary what it was his duty to know as a cofiduciary unless he has been prevented from obtaining such knowledge. In re Niles, 113 N. Y. 547, 21 N.E. 687; Scullin v. Clark (Mo. 1951), 242 S.W.2d 542, 29 A. L. R.2d 1024; and In re Estate of Tolfree, 347 Mich. 272, 79 N.W.2d 629, 65 A. L. R.2d 1008.

The applicable rule of estoppel as to the accounting is stated in Chirurg v. Ames, 138 Iowa 697, 116 N.W. 865. We there said, at page 707 of 138 Iowa, page 868 of 116 N.W.:

"We do not intend to modify in any respect the duties ordinarily owing by a trustee to his cestui que trust. Absolute good faith and a strict accounting is ordinarily required. But where the cestui is of full age, and induces the very conduct of which he complains, is satisfied with the methods adopted while they are progressing, interferes himself with the duties of the trustee, and keeps part of the accounts himself, no such strictness is required as in the ordinary case. We cannot hope to have made an absolutely accurate accounting. That would be impossible under the record before us. Neither a referee nor a master, no matter what his knowledge or experience, could hope to do more than reach approximate results. That we have done to the best of our ability. It appears, too, that an auditor went over defendant's accounts and made a statement, which is in the record. The trial court also went over them, and found nothing due the plaintiff. We have again gone over them, and, while we find the errors heretofore indicated, they are not such as to change the general result. We find nothing of which plaintiff may justly complain."

The applicable rule of estoppel as to appellant's actions in general in relation to the estate matters including the accounting now possible is not a technical estoppel. It is variously designated as concurrence, acquiescence, confirmation, ratification and estoppel and is a part of equity jurisprudence. It arises when a competent beneficiary with full knowledge of the

facts, or charged with knowledge because he is a cofiduciary, as here, confirms or ratifies the handling of the trust or estate by his cofiduciary. A showing of reliance on the basis of the approval is not a necessary feature of the ratification. Scullin v. Clark (Mo. 1951), 242 S.W.2d 542, 29 A. L. R.2d 1024, 1032, 1033, and citations; In re Estate of Whitman, 221 Iowa 1114, 1126, 1127, 266 N.W. 28, 35; and In re Niles, 113 N.Y. 547, 21 N.E. 687, 690.

In this case it is not necessary to show Mrs. Jackman would have made an accurate accounting upon closing of the P. C. Jackman estate if it had not been for appellant's approval of the method pursued. He could have required a full accounting.

V. When the bank stock was sold as above noted, appellant joined with his stepmother, a lady then in her 80's, in placing the funds in an estate account on which either of them could draw checks. He then left her to handle the estate business and invest the funds. The act of placing this money in a checking account was wholly inconsistent with investing all of that amount to produce an income for the life tenant and secure the remainder for appellant. This is enough to sustain a finding, necessarily included in the trial court's decision, that some expenditures were contemplated other than investing the fund.

$9800 of this $10,404 was checked out in five checks. One for $1500 has been discussed and what has been said about this account in general is applicable to the payment of the mortgage. Also as having a bearing not only on the mortgage but other estate expenses if any, it should be noted the bank stock was a special bequest subject to abate ratably with specifically devised realty for the payment of debts after the general assets are exhausted. Nolte v. Nolte, 247 Iowa 868, 881, 76 N.W.2d 881, 56 A. L. R.2d 854.

Two of the checks were in amounts of $1000 each. According to appellant's testimony he received one of them and his stepbrother, James W. Fay, the other. At the time Mrs. Jackman gave him his check she told him Mr. Fay had just saved the estate $2000 in taxes, and that she thought it would be nice to divide it between the two boys. As to his own check, certainly appellant cannot receive that money again. That would bring

about a fraudulent result. As to the check given Mr. Fay, from what his stepmother said at the time, appellant was bound to know she was giving away estate funds which neither she nor he had any right to do. No matter what appellant contends as to his lack of knowledge we do not think he can be heard to say he then thought his stepmother was giving away her property. This is sufficient evidence to sustain a finding that appellant is estopped to claim this $1000 should be paid to him. Here he has stood by while his rights as a beneficiary were being violated. Helwig v. Fogelsong, 166 Iowa 715, 148 N.W. 990; and McCartney v. Schuette, 243 Iowa 1358, 54 N.W.2d 462.

The life tenant purchased certificates of deposit with the $5000 check. And part thereof is directly traceable in the hands of her executrix in the form of Certificate of Deposit No. 9161 in the sum of $3323.10 awarded by the trial court to appellant, likewise the check for $1300 deposited in Mrs. Jackman's personal account on July 25, 1955. The evidence shows she purchased a certificate of deposit on June 9, 1956, with a check drawn on her own account. This is traceable to Certificate of Deposit No. 8608 also awarded to appellant. This leaves $604 of the proceeds of the bank stock unaccounted for. As to this amount as well as the excess of general assets we think appellant is now estopped to complain. He required no accounting when the estate was closed when it would have been far easier to make an accurate accounting than now. He makes no attempt to excuse his failure at that time on the grounds he was prevented, merely that he had nothing to complain about. The theory of estoppel expressed in Chirurg v. Ames, supra, 138 Iowa 697, 116 N.W. 865, is applicable.

The fraudulent result necessary to estoppel, Ames Trust and Savings Bank v. Reichardt, 254 Iowa 1272, 121 N.W.2d 200, 202, is requiring one to pay a second time an item previously paid where it cannot be determined the previous payment was improper.

VI. When the P. C. Jackman estate was closed in December 1957, Mrs. Jackman did have in her possession and control an additional Certificate of Deposit No. 7341 as originally purchased for $1000, No. 8114 when cashed. This one had

been originally purchased with the $5000 charged against the estate account. This certificate was cashed September 26, 1958. At that time Mrs. Jackman had in her personal account $5657.45, in her own name certificate of deposit in the sum of $2000, and she owned her own home. There is no showing as to the use of the money. It does not appear in her personal account. The appellant is estopped to say she could not use her own discretion in determining what was required for her care and support by the interpretation both of them put on the will by closing the estate and proceeding as they did. In re Estate of Whitman, 221 Iowa 1114, 266 N.W. 28. But he is not estopped to question the good faith of her discretion where the record shows she could not possibly use the expenditure for her necessary care and support. There was no possible expenditure in the sum of $1000 Mrs. Jackman could have made for her care and support on September 28, 1958, that could not have been made from her personal account in which she had over $5000 of accumulated income. She was regularly receiving income from the farm realty and social security. In fact from then until her death she always had on hand in excess of $5000 in accumulated income. Her right as a life tenant to invade the corpus was limited to care and support as required. Tiemann v. Kampmeier, 252 Iowa 587, 592, 107 N.W.2d 689, 692.

The good faith of the life tenant is subject to judicial review. In re Estate of Rorem, 245 Iowa 1125, 1138, 66 N.W.2d 292, 47 A. L. R.2d 1089; Lovrien v. Fitzgerald, 242 Iowa 1258, 49 N.W.2d 845; and Watkins v. Dean, 243 Iowa 599, 52 N.W.2d 498. As bearing on the correctness of the determination the certificate of deposit was not used for necessary care and support, see Lovrien v. Fitzgerald, supra, at page 1268 of 242 Iowa, at page 850 of 49 N.W.2d. The funds in the hands of the executrix of the life tenant were augmented to the extent of $1000 so used by the life tenant. It is not necessary to trace the money into any specific fund or account but is sufficient to show the fund on hand has been augmented to that extent. District Township of Eureka v. Farmers' Bank of Fontanelle, 88 Iowa 194, 201, 55 N.W. 342.

Of the five $1000 certificates of deposit purchased by the

life tenant, Mrs. Jackman, in the name of the P. C. Jackman estate, four have been accounted for. The fifth was cashed by Mrs. Jackman November 4, 1957, from this she received $1081.20 and deposited it in her personal account. The receipt of the State Tax Commission for payment of inheritance tax in the Fay estate of $1107.05 is dated November 12, 1957; on November 16, 1957, a check in that amount was charged to Mrs. Jackman's account. As above pointed out, this was paid for appellant's benefit from her own funds as a part of the administration of the Fay estate.

By way of recapitulation, the record shows Mrs. Jackman had in her hands in general assets $2732.05, in proceeds of the bank stock $10,404. That she paid proper charges in the P. C. Jackman estate, funeral expenses $910.56, attorney $835.50, and inheritance taxes $478.67, or a total of $2224.73. Court costs are not included in this total. In some manner the $1500 mortgage was paid. This is to appellant's benefit, he now has the 80 acres free of the mortgage. The inheritance tax in the Fay estate was paid by Mrs. Jackman in the sum of $1107.05. And as to the $1000 checks given to appellant and his stepbrother he is clearly estopped.

At the time the P. C. Jackman estate was closed in December 1957 the record shows Mrs. Jackman had received $13,136.05 from the P. C. Jackman general assets and the sale of the bank stock. She made proper expenditures of $2224.82. She had paid out $4607.05 as to which appellant is clearly estopped, and had on hand certificates of deposit for which she had paid $5300. The balance is $1004.18. Without question the court costs are properly deductible from this amount; likewise any outstanding taxes or debts owed by decedent, P. C. Jackman, on the date of his death. Until the estate was closed Mrs. Jackman and appellant had equal duty to account as coexecutors. Sections 638.2, 638.3 and 638.4, Codes of Iowa, 1946, 1954, 1958, 1962. They are considered as one. Section 638.22. If a proper accounting had been made it could be determined whether or not any of the apparent balance should in fact be held by Mrs. Jackman as a life tenant. Appellant as an executor who joined in the final report cannot be heard to say he did

not know this. He participated in filing the final report in this manner. This has rendered accurate accounting impossible. Because of this he is estopped. This is the theory of estoppel expressed in Chirurg v. Ames, 138 Iowa 697, 116 N.W. 865, and Scullin v. Clark (Mo. 1951), 242 S.W.2d 542, 29 A. L. R.2d 1024.

The practice of closing estates without an accounting is disapproved.

The life tenant recognized the remainder interest to the extent of the certificates of deposit awarded to appellant by the trial court and in the purchase of the additional one, No. 7341, in the sum of $1000. This last certificate is traceable into the funds held by Mrs. Jackman in that it was used in place of other funds in the hands of the life tenant.

As stated, there is sufficient evidence to sustain the ruling of the trial court in all respects except as to the additional certificate of deposit cashed by the life tenant September 26, 1958. As a matter of law the life tenant did not use this for necessary care and support. No question of law or fact remains to be determined on a retrial. The order of the trial court is modified in part, reversed in part, and remanded with directions to enter an order directing the executrix of the estate of Sadie F. Jackman, deceased, to pay to appellant, Emmett C. Jackman, the proceeds of the Certificates of Deposit Nos. 8608 and 9161 in the sum of $4649.10, together with any interest which may have accrued thereon since the date of decedent's death, and to pay said Emmett C. Jackman an additional sum of $1000 with interest thereon from the date of decedent's death at the rate of five percent per annum, within 30 days after the issuance of the procedendo from this court. Costs in this court are taxed to the estate.—Modified in part, reversed in part, and remanded with directions.

GARFIELD, C. J., and HAYS, LARSON, PETERSON, SNELL and MOORE, JJ., concur.

STUART and THOMPSON, JJ., dissent.

STUART, J. (dissenting)—I feel compelled to dissent from the majority opinion.

In this case the beneficiary of the remainder interest in bank stock which had to be sold under an agreement with the bank permitted the life tenant to assume control of the funds. At the life tenant's death only part of the funds could be traced, although her estate was large enough and her income such that she did not have to spend any part of it for her support and maintenance. The remainderman was coexecutor of the Will with the life tenant and he signed the necessary papers, but left the estate matters entirely up to the life tenant.

The opinion states it is the duty of an executor to know the business of the estate. I agree with this statement but I do not consider the fund of $10,404 derived from the sale of stock an estate matter. It was placed in the hands of the life tenant who was entitled to the income for life. It is the responsibility of the life tenant to account for funds entrusted to her. Heintz v. Parsons, 233 Iowa 984, 9 N.W.2d 355; 31 C. J. S., Estates, section 33, page 42.

The majority opinion is based upon the doctrine of estoppel. Estoppel is founded upon the idea that one who has taken a certain position or made a certain representation should not thereafter be permitted to change his position to the prejudice of one who has relied thereon. Riggs v. Meka, 236 Iowa 118, 17 N.W.2d 101; Ames Trust and Savings Bank v. Reichardt, 254 Iowa 1272, 121 N.W.2d 200. There is no proof the remainderman did anything which would make the life tenant believe she could use these funds as she desired, or commingle them with her own and escape the responsibility of accounting for the funds entrusted to her. In my opinion none of the elements of estoppel is present. All remainderman did was to let the life tenant handle the funds, which she had a right to do under the will.

The majority relies upon the case of Chirurg v. Ames, 138 Iowa 697, 707, 116 N.W. 865. The facts are not similar to the case at bar. In that case the expenses were largely for the benefit of the cestui que trust and were incurred at her insistence. The funds were not used by trustee for her own benefit. She was of full age at the time. She then demanded a strict accounting which the trustee was not in a position to make. The court said:

"Having led the mother into her extravagant notions, insisted upon a somewhat lavish expenditure of money, and asked no accounting at any time, she is not now in a position to demand a scientific and accurate accounting from the mother. In general she knew of the expenditures made on her behalf at the time they were made, and she never made any protest until just before the bringing of this suit. The expenditures were many, most of them for small items, and it was impossible at the time of trial for the defendant to have any distinct recollection of the different items. * * * We do not intend to modify in any respect the duties ordinarily owing by a trustee to his cestui que trust. Absolute good faith and a strict accounting is ordinarily required. But where the cestui is of full age, and induces the very conduct of which he complains, is satisfied with the methods adopted while they are progressing, interferes himself with the duties of the trustee, and keeps part of the accounts himself, no such strictness is required as in the ordinary case."

There is no evidence in this case remainderman in his capacity as coexecutor or remainderman led the life tenant to believe she could convert these funds to her own use. Nor is any prejudice to the estate of the life tenant shown had there been such conduct.

Even accepting the court's theory that the fraudulent result necessary to estoppel is requiring one to pay a second time an item previously paid where it cannot be determined the previous payment was improper. The only items which could possibly come within this requirement would be the $1000 paid to remainderman out of "taxes saved" and the inheritance tax on the inheritance from his stepbrother in the amount of $1107.05. This is all that the evidence shows could ever have been received by the remainderman. The land upon which the $1500 mortgage payment was made was land given to the stepbrother. Although remainderman later received it through the stepbrother's will, there was no certainty it would go to him when the life tenant made payment.

In my opinion the majority opinion places a heavy burden upon the remainderman to make sure his fund in the hands of a

life tenant remains intact, which burden he has never had before.

THOMPSON, J., joins in this dissent.